UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| ADAM SCOTT, by and through his legal Guardian and Next Friend Donna Taylor, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 2:12CV31 HEA ) |
| ROBERT DAWSON, et al., | ) ) |
| Defendants, | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the court on the remaining Defendants' Motion for Summary Judgment. [Doc. No. 126]. Plaintiff opposes the Motion. For the reasons that follow, the Motion is granted.

## BACKGROUND

Plaintiff filed his Complaint on April 11, 2012. After initial review, and several motions, Plaintiff's remaining claims are against Defendants Dawson, Moore and Shively in their individual and official capacities. Plaintiff alleges pursuant to 42 U.S.C. § 1983 that Defendants were deliberately indifferent to a risk of sexual assault and failed to train jailers to prevent assaults at the Macon County Jail.

## RELEVANT UNDISPUTED FACTS

Adam Scott (hereinafter "Scott") became incarcerated at the Adair County jail in June 2008. Scott was held at the Adair County Jail until November 23, 2009, when he was transferred to the Macon County Jail. At the time of the incident involving Nathanial Flennory, Scott was being held in jail on charges of forcible rape. While Scott was housed at the Adair County Jail from June 2008 until November 2009, Adair County employees did not tell him the nature of the charges filed against any of his cellmates. While Scott was housed at the Randolph County jail, jailers and staff at Randolph County never informed him what any of the other inmates' charges were.

Scott was first held at the Macon County Jail from November 23, 2009, to November 25, 2009. On November 25, 2009, Scott was transferred from the Macon County Jail to the Randolph County Jail. Scott was transferred from the Randolph County Jail to the Macon County Jail on January 28, 2010, where he remained until May 31, 2010.

Scott never spoke with Sheriff Dawson while he was lodged at the Macon County Jail. Scott never saw Sheriff Dawson while he was at the Macon County Jail.

Shortly after returning to the Macon County in January 2010, Scott asked to be held in isolation because other inmates were being loud and obnoxious. The officers complied with his request and placed him in isolation for a couple of days.

While Scott was at the Macon County jail he slept all morning, all night, and basically all day.

After the incident with Flennory, Scott told Moore where he had been bit and that it bled a little bit, that he did not want to get an infection, so he asked David Moore for triple antibiotic ointment. Scott did not ask anyone at the Macon County jail to see a doctor after the incident involving Flennory.

The morning after the incident with Flennory, to-wit May 31, 2010, Scott was transferred back to the Adair County Jail. When Scott was back at Adair County, Adair County did not allow him to see a medical professional or provide him with any antibiotic ointment for his penis as a result of the incident with Flennory.

As a result of the incident with Flennory, Scott has a scar on his penis that is about the size of a pencil eraser. Scott did not get an infection as a result of the incident with Flennory and no further medical treatment was required. (Exhibit "A", Pg. 114, L:20-23). He did not require any emergency medical treatment while he was at Macon County.

When Scott was at the Macon County Jail from November 23, 2009, until November 25, 2009, he did not encounter Flennory.

Prior to being at the Macon County Jail in January 2010, Scott did not know Flennory. He did not know the reason why Flennory was incarcerated.

When Scott arrived at the Macon County Jail in January 2010, he was initially placed in general population but he was not placed in the same pod as Flennory. After being at the Macon County Jail for a short while, Scott, at his request, was placed in isolation for a couple of days and upon his release he was placed in a pod with his cousin, Stephen Munn, and two other gentlemen.

During the time that Scott was in a pod with Stephen Munn, Nathaniel Flennory was in a pod on the other side of the wall of the pod where Scott was housed. During the time that Flennory was on the other side of the wall, Scott and Flennory would talk through the walls. During that time, Flennory did not make any threats to Scott. Flennory did not threaten Scott in any manner and Flennory did not make any threats of physical violence or sexual assault to Scott.

At some point, Scott was moved into the same pod as Flennory. Prior to moving into the same pod with Flennory, Moore asked Scott if he wanted to move into the same pod as Flennory and Scott said "yes." Flennory and Scott had been housed in the same pod for a week or less at the time the incident occurred.

At some point during the time that Flennory and Scott were housed in the same pod, Flennory told Scott that he had hit another inmate in the eye and the other inmate was taken to the hospital for stiches. Flennory told Scott that the jailers were told that the injury to the other inmate was caused when the other inmate fell and hit his eye on the toilet bowl. None of the jailers were aware that

Flennory hit another individual. Scott never told Moore, Shively, or any of the jailers that Flennory had hit another individual.

Up until the time that Scott moved into Flennory's pod, he and Flennory were cordial and nice to each other. (Exhibit "A", Pg. 129, L:8-14). They were getting along. Scott and Flennory would occasionally play cards together. Flennory would occasionally sit in Scott's cell and talk with him. The night before Flennory bit Scott's penis, Flennory got ahold of a bat and put the bat in Scott's face and told Scott that if Scott did not touch his chest he would let the bat bite Scott. The incident with the bat occurred between 6:00 p.m. on May 29, 2010 and 6:00 a.m. on May 30, 2010.

Scott claims that at the time that Flennory had the bat, Shively was coming through the jail and took the bat from Flennory. Scott claims that after Shively took the bat from Flennory, Flennory went to bed. Plaintiff does not know if Shively heard anything that Flennory said during the incident with the bat. He did not believe that during the incident with the bat that Flennory was attempting to get Scott to touch his chest in a sexual manner. Scott testified that he was not scared of Flennory due to the incident with the bat. He thought that Flennory was playing around, acting childish and being a prankster during the event with the bat. Based upon Scott's experience, sometimes people in jail pull pranks and mess around with each other. After the incident with the bat, Plaintiff testified that he and

Flennory continued to act in a friendly manner. Scott did not request to be moved away from Flennory after the incident with the bat. .

Up until the incident with the bat, Flennory had never asked Scott for any sexual favors. Up until the incident with the bat, Flennory had never asked Scott to touch him inappropriately. Up until the incident with the bat, Scott was not scared of Flennory in any manner.

The morning of May 30, 2010, Flennory was in Scott's cell and Flennory showed Scott his penis and said he wished it was bigger. Scott thought that when Flennory showed his penis and made the statement, that he was just being "ignorant." Flennory only had his penis out for a second. The whole incident where Flennory showed Scott his penis lasted for 30 seconds. When Flennory showed Scott his penis, Scott told Flennory that he was nasty and he did not want to see it. During the incident where Flennory showed Scott his penis, Flennory did not move toward Scott. The incident where Flennory showed Scott his penis occurred after breakfast but before lunch. When Flennory showed Scott his penis, Scott thought he was just playing around. Scott did not tell any officers or employees of the Macon County Jail that Flennory had showed him his penis. Scott did not think much of Flennory showing his penis and he thought that Flennory was playing around.

Later on May 30, 2010, Scott and Flennory were playing cards. Scott was sitting on the toilet seat in the cell and Flennory was sitting on Scott's bunk and Flennory leaned over and put his finger down the crack of Scott's buttocks. Flennory stuck his index finger in Scott's butt crack. While Flennory stuck his finger in Scott's butt crack, Flennory laughed for approximately 20 seconds. Flennory did not make any sexual comments to Scott when he stuck his finger in Scott's butt crack. When Flennory stuck his finger in Scott's butt crack, Scott grabbed Flennory's hand and pushed it away and told Flennory he was done playing cards. At that point, Flennory went back to his cell.

Scott had taken his night medication right before he and Flennory played cards. Scott and Flennory then played cards for 20 minutes before the incident with the finger happened. Then Flennory left and Scott went to bed. .

Scott testified that he did not have any idea if an officer came by between the time that Flennory touched his butt crack and the time he woke up the evening of May 30, 2010. Scott did not yell out for help after the finger incident.

After the finger incident, Scott later woke up with Flennory on top of him and Flennory was biting his penis. When Scott woke up, Flennory had Scott's penis in his mouth. He shoved Flennory off of him. When Scott pushed Flennory off of him, Flennory bit Scott's penis.

At the same time that Scott pushed Flennory off, Shively popped the lock on the downstairs door and Flennory ran to his cell. When Shively walked through, Scott reported the incident to Shively and Shively took Scott to a pod by himself.

Exhibit "H" represents the mark that was left by Flennory on Scott's penis.

Scott noted that the bite bled and there was blood on the front of his pants. Scott's pants would have been orange and the blood spot was not larger than the end of a BIC pen cap. Scott told David Moore that he had bled and showed him the blood spot on his pants. When he saw Moore on May 31, 2010, the bite mark on his penis was no longer bleeding.

The incident with Flennory lasted 60 seconds tops from the time Scott woke up, Flennory got off of him and Shively popped the key downstairs. As soon as Scott told Shively he needed to talk to him, Shively pulled him out of the cell and spoke with him in private about what occurred. Once Scott told Shively what occurred, Shively immediately removed Scott from the cell. At the time that Shively showed up, there was no visible blood on Scott's pants. Shively asked Scott if he wanted to file a report. The officer who took the report wrote out Scott's statement and Scott signed it.

When Scott was transferred back to Adair County, he requested antibiotic ointment but was not provided with any.

Scott testified that he was aware during his time in jail that if he had any concerns he could discuss those with the jail staff.

Flennory was being held in the Macon County Jail on forcible rape charges. . Scott has been diagnosed as a compulsive liar.

Scott has given several versions of the events of May 30, 2010 and May 31, 2010. Scott previously stated, under oath, that he was provided with his medication on May 30, 2010 around 11:00 p.m.

Scott testified during his deposition that the incident where Flennory bit his penis occurred between 8:30 p.m. and 9:00 p.m.

After the incident involving Flennory, Adam Scott gave an oral statement to Deputy Tyler Souther. Scott signed the statement that was written out by Deputy Tyler Souther. In his statement to Souther, Scott stated that on May 30, 2010, after dinner, he was in his cell and Flennory came into his cell. When Flennory came into his cell, Flennory said he was "dizzy" and Flennory fell over and his head landed between Scott's legs. Scott noted that when Flennory fell over, Flennory "nibbled" on his crotch through his clothes with his mouth. After Flennory nibbled on Scott's penis, Flennory left Scott's cell. In his statement to Deputy Souther, Scott noted that Flennory then came back to his cell a while later and laid down on his bed. In his statement to Deputy Souther, Scott noted that while Flennory was lying on his bed, Flennory put his fingers down the crack of his buttocks. In his

statement to Deputy Souther, Scott noted that when Flennory put his fingers down his crack, he got up and left his cell. In his statement to Deputy Souther, Scott noted that when Shively came by, Scott requested to speak with Shively in private and requested to be moved and Shively complied with Scott's request.

Michael Shively did not work at the Macon County Jail as a night jailer the two evenings before May 30, 2010. On May 30, 2010, Shively began his shift at 6:05 p.m. Prior to Scott making his report to Shively, Shively was not aware of Flennory making threats of physical violence or sexual innuendos to any other inmates. Prior to Scott making his report to Shively, Shively was not aware of any other assaults by Flennory of any other inmates at the Macon County Jail. Shively never observed any interaction between Scott and Flennory which caused him any concern for Scott's safety around Flennory.

Scott did not speak with any officers at the Macon County Jail about the jail cells not being locked overnight.

Stephen Munn (hereinafter "Munn") was not aware of any assaults or acts of violence by Flennory or on any other inmates. Munn never heard Flennory threaten harm to any other inmates of the Macon County Jail. Munn never heard Flennory state or discuss harming or assaulting any other inmates during his time at Macon County. Flennory never told Munn that he had harmed any other inmate during his time at Macon County.

Shively began working at the Macon County Jail as a jailer/dispatcher in approximately July 2008. Shively worked at the Macon County Jail as a jailer/dispatcher until approximately 2012 when he was promoted to jail administrator. Shively was trained as an EMT from 1998 through 1999. Shively was an EMT for five years.

The Macon County Jail was set up so that there were six jail cells on the first floor and eight jail cells on the second floor.

Shively never registered Flennory as a sex offender during the time that he acted as a dispatcher/jailor.

When Flennory was at the Macon County Jail in 2009 and 2010, Shively did not know that Flennory was a registered sex offender.

During the time that Shively was a jailor/dispatcher at the Macon County Jail, Flennory was held at the Macon County Jail approximately two to three times. Shively knew that one of the times that Flennory was held it was on a charge of forcible rape under compulsion but he did not know what Flennory was held at the Macon County Jail for on the other two occasions.

Shively worked day shift as a jailor from July of 2008 through July of 2009 and then he worked the night shift from July of 2009 until 2012. The night shift at the Macon County Jail ran from 6:00 p.m. to 6:00 a.m. The evening meal was fed to inmates at the Macon County Jail at approximately 7:00 p.m.

The Macon County Jail policy was to lock down inmates in their individual jail cells every evening at midnight. When Shively worked the night shift he followed the policy regarding lockdown every night within a half hour either way of midnight.

Scott told Shively that Flennory had nibbled on Scott's penis. Shively first became aware of Flennory when he was an inmate in the Macon County Jail. To Shively's knowledge there was never an inmate who occupied the same jail pod as Flennory who had to be transferred by ambulance for medical care.

Jailor, Adam Miller, was working on April 23, 2010, at 2:58 a.m. when inmate James Wright needed an ambulance called for a head injury. Inmate James Wright told Miller that he had fallen and hit his head on a sink. Miller asked Wright what happened and Wright stated that he fell and hit his head. Mr. Wright's injuries appeared to be consistent with his story that he fell and hit his head.

Miller is not aware of any incidents prior to the one involving Scott where any other inmates claimed that Flennory attempted to harm them or assault them in any manner. No inmates at the Macon County Jail ever told Miller that Flennory had assaulted them or attempted to harm them in any manner.

Shively started his shift on May 30, 2010 at 6:05 p.m. During jail checks, Shively would go around the catwalk and look in the cells and then come back. When Shively did his jail inspections he would always unlock the master lock and go down the cat walk.

On May 30, 2010, there were eleven (11) inmates at the Macon County Jail.

During the month of May 2010, Shively attempted to lock every jail cell within a half an hour of midnight.

On May 30, 2010, Shively gave Scott his medication at approximately 9:37 p.m.

Shively conducted a jail check at 11:05 p.m. on May 30, 2010 and noted that all inmates were ok. On May 31, 2010, Shively came through the jail at approximately 12:20 a.m.

On the walkthrough at 12:20 a.m., Scott told Shively that he wanted to speak with him. On the 12:20 a.m. walkthrough, Shively was going around to lockdown the jail cells. (Exhibit "S", #10). On the 12:20 a.m. jail check on May 31, 2010, Shively locked everyone down and then pulled Scott out in the wing to talk to him. Shively locked everyone in the upstairs jail cells down at the time of this incident.

Scott did not say whether the nibbling occurred over clothes or under clothes. Scott told Shively that Flennory acted like he was going to fall down and then fell down face first and nibbled on his penis. Scott never told Shively that

Flennory pulled his pants down and that his penis was bitten. Scott never told Shively that he was bleeding nor did he ever ask Shively for any medical treatment. Scott did not appear to Shively to be traumatized by the incident with Flennory.

Shively received notice of the incident at approximately 12:25 a.m. Immediately after Scott told Shively the incident, Shively called Deputy Souther and Jail Administrator Moore.

After being notified of the incident, Shively immediately moved Scott to wing four in the jail. After moving Scott, he would have been the only one in the jail pod.

Shively was not aware that Flennory had thrown a bat at Adam Scott. Shively did not take a bat away from Flennory. The only incident Shively recalls with the bat is where Shively caught a bat that was flying around the jail and killed it.

During Shively's shift, after the incident involving Scott, Flennory was moved to segregation. Jail Administrator Moore is the one who made the decision to put Flennory in segregation.

Prior to the incident where Flennory bit Scott's penis, Scott did not talk to any of the officers of the Macon County Jail regarding lockdown as he was not "in

fear of nothing" and he "didn't have no fears so [he] had no reason to gripe about a cell."

Sheriff Dawson issued a reprimand to an employee of the Macon County jail following an incident in August 2010.

At the time of the incident involving Scott and Flennory, Moore was not on duty or present at the Macon County Jail. At the time of the incident involving Scott and Flennory, the standard operating procedure and policy at the Macon County Jail required inmates to be locked down in their cells at night. At the time of this incident, the policy of the jail was to try to lock inmates into their cells something between 10:00 p.m. and midnight. Prior to the incident involving Scott and Flennory, Moore was not aware of any occasions where the jail cells were not locked down at night. Moore was not aware of the cells in the pod where Scott was housed at the time of the incident not being locked down overnight. Prior to May 30, 2010, Moore had not heard from any inmates at the Macon County jail that the jail cells were not being locked down overnight.

No issues concerning Shively locking down the jail cells at night came to Moore's attention prior to the incident involving Scott. No issues concerning Shively doing timely jail checks ever came to Moore's attention prior to the incident involving Scott. It was Moore's understanding that the incident concerning Scott was reported to Shively when Shively was coming through the

jail to lock down the jail cells for the night. Moore was unaware of any physical injury to Scott as a result of the incident involving Flennory. Moore did not know that Flennory would harm or attempt to harm Scott in any manner. To Moore's knowledge, Flennory had been housed at the Macon County Jail numerous times prior to the incident involving Scott and there had never been any claims by any other inmates where Flennory had assaulted them. Moore was unaware of any claims by any other inmates of the Macon County Jail indicating that Flennory had threatened them, tried to sexually assault them, or tried to harm them in any manner prior to the incident involving Adam Scott. Moore did not believe that Scott was at risk of harm from Flennory. Moore was unaware of any other assaults at the Macon County Jail, prior to the claims involving Adam Scott. Moore was unaware of any statements by Flennory that indicated that he would sexually assault Scott. Scott never indicated to Moore that he was afraid of or had been threatened by Flennory in any manner. Prior to the incident involving Scott, Moore had not received complaints from any other inmates regarding Flennory.

From September 25, 2009 until May 31, 2010, Flennory's incarceration at the Macon County Jail was without incident.

Prior to the incident involving Scott, the staff at the Macon County Jail never reported to Moore that the jail cells were not locked down at night.

Moore did not work over night at the Macon County Jail.

Newly hired jailers for the Macon County Jail received at least 36 hours of on the job training prior to working on their own. At the time of this incident, the on the job training for new jailers required them to shadow an experienced jailer prior to working on their own.

After the incident where Flennory put his finger in Scott's butt crack is when Scott started to get worried.

Moore did not know Flennory to be capable of violence at the time of the incident involving Scott. Moore did not know Flennory to be a sexual predator. At the time of the incident involving Scott, Moore did not know that Flennory had been arrested or convicted of assault on a law enforcement officer, of domestic assault, or of unlawful use of a weapon.

At the time Flennory came into the custody of the Macon County Sheriff's Office, the office could not run a MULES report to access the individual's criminal history or arrest records.

Moore did not complete any of Flennory's sex offender registration documents through the Macon County Sheriff's Office.

During the times that Flennory and Scott were housed in the same pod, when Moore observed them they were cordial and appeared to socialize in a friendly manner.

At time of the incident involving Scott and Flennory, Moore was the jail administrator at the Macon County Jail.

It was the practice of the Macon County jailers to conduct jail checks near every hour irregularly. For instance it could be done at 45 minutes, then an hour to an hour and 10 minutes the next time so as to not establish a pattern or set time where the jailer would be checking on the inmates.

Shively did not know that Flennory had been convicted of any crimes where claims or allegations of violence were involved. At the time of the incident involving Scott, Shively did not know that Flennory had been arrested or convicted of assault on a law enforcement officer, of domestic assault, or of unlawful use of a weapon.

Prior to Scott making his report to Shively, Shively was not aware of Flennory making threats of physical violence or sexual innuendos to any other inmates. Prior to Scott making his report to Shively, Shively was not aware of any other assaults by Flennory of any other inmates at the Macon County Jail. Shively never observed any interaction between Scott and Flennory which caused him any concern for Scott's safety around Flennory. Shively did not work as the night jailer the two evenings before May 30, 2010. (Exhibit "S", #9).

At the time that Scott reported the incident involving Flennory to Shively, he was going around to lockdown the jail cells.

In 2009 and 2010, Robert Dawson was the Sheriff of Macon County, Missouri. At the time of the incident involving Scott and Flennory, Dawson was not on duty or present at the Macon County Jail.

At the time of the incident involving Scott and Flennory, the standard operating procedure and policy at the Macon County Jail required inmates to be locked down in their cells at night. Dawson is unaware of any occasions where Shively did not lock down the jail cells at night. The first time a failure to lock down jail cells was reported to Dawson was August 30, 2010. Prior to that time, Dawson was unaware that any jail cells were not being locked down at night. To Dawson's knowledge, the first time the jail cells were not locked down at night was August 29, 2010 which was several months after the incident involving Scott. Dawson did not know that Flennory would attempt to harm Scott in any manner. Dawson was not aware of any physical injury to Scott as a result of the incident involving Flennory.

Flennory had been at the Macon County Jail numerous times prior to the incident involving Scott. Prior to the claims made by Scott, Dawson never received any complaints from any other inmates that Flennory had assaulted them or made any sexual remarks nor was Dawson made aware of any such complaints by anyone. To Dawson's knowledge, Flennory had not assaulted or attempted to

assault any other inmates during the time that he was incarcerated at the Macon County Jail and prior to the incident involving Scott.

Dawson never instructed any of the staff of the Macon County Jail or Sheriff's office to leave the jail cells unlocked at night.

During Dawson's tenure as Sheriff of Macon County, prior to the incident involving Scott, Dawson was not aware of any other assaults that occurred at the Macon County Jail.

Dawson is unaware of any other statements by Flennory that indicated he would sexually assault Scott.

Dawson did not decide where Flennory or Scott were placed in the Macon County Jail.

From September 25, 2009 until May 30, 2010, Flennory's incarceration at the Macon County Jail was without incident.

Prior to an incident occurring on August 30, 2010, no one at the Macon County Jail ever reported to Dawson that jail cells were not locked down over night.

Jailers at the Macon County jail received on the job training which was overseen by the jail administrator and another experienced jailer, prior to working on their own.

To Dawson's knowledge, Flennory's prior convictions related to sex acts involved females.

Dawson had instructed David Moore, jail administrator, to tell all the newly hired jailers to lock the jail cells down at night.

Newly hired jailers were supposed to review the Macon County Jail Manual. Newly hired jailers receive one-on-one training until the jail administrator is satisfied that they are capable of performing the job. All newly hired jailers receive at least 36 hours of on the job training prior to working on their own.

Nathaniel Flennory had been held at the Macon County Jail the following dates:  May 24, 1995 to June 7, 1995; August 16, 1995 to August 18, 1995; October 23, 1996 to November 4, 1996; May 27, 1998 to June 30, 1998; September 20, 1998 to October 16, 1998; June 18, 2007 to July 18, 2007;  August 8, 2007 to August 9, 2007; and September 25, 2009 to August 30, 2010.

At the time that Adam Scott was lodged at the Macon County Jail, he weighed approximately 210 pounds, he was 32 years old, and he was 6'1" tall.

## DISCUSSION

### Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.,* 838 F.2d 268, 273 (8th Cir.1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir.2000) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy. *See Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1114 (8th Cir.2004). Self-serving, conclusory statements without support are not sufficient to defeat summary judgment. *Armour and Co., Inc. v. Inver Grove Heights,* 2 F.3d 276, 279 (8th Cir.1993).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir.2005). The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir.2000). However, the court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chemical Interchange Co.,* 541 F.2d 207, 210 (8th Cir.1976).

> Local Rule 7-4.01(E) provides with respect to summary judgment motions: A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E.D. Mo. L.R. 7-4.01(E).

Defendants argue that they are entitled to qualified immunity because Plaintiff has not shown the violation of a constitutional right. The court agrees.

## Qualified Immunity Standards

A government official is entitled to qualified immunity unless he has violated a clearly established constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Ryan v. Armstrong*, No. 16-1341, 2017 WL 894459, at *2 (8th Cir. Mar. 7, 2017). Qualified immunity is a question of law to be determined by the court. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "Public officials, of course, are entitled to qualified immunity from liability for damages under 42 U.S.C. § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Doming v. Van Pelt*, 235 F.3d 1091, 1096 (8th Cir. 2000) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In short, "qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information [that the defendant] possessed." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (citations and quotations omitted). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* (citations and quotations omitted).

The court focuses on two questions to determine whether a state official is entitled to qualified immunity: "(1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a

constitutional or statutory right; and, if so, (2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand that their conduct was unlawful...." *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006) (citations and quotations omitted). Thus, the "initial inquiry is whether the facts as alleged show that the officers' conduct violated a constitutional right....If the facts do not show a violation, [a court] need not proceed further with the qualified immunity analysis." *Brockinton v. City of Sherwood*, 503 F.3d 667, 672 (8th Cir. 2007).

Government officials are personally liable only for their own misconduct. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir.2010), citing *Otey v. Marshall,* 121 F.3d 1150, 1155 (8th Cir.1997). Thus, "[t]he doctrine of qualified immunity requires an *individualized* analysis of *each* officer's alleged conduct." *Walton*, 752 F.3d at 1125 (quotation omitted). When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts. *Livers v. Schenck,* 700 F.3d 340, 355 (8th Cir.2012).

This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right. Allegations of generalized notice are insufficient. "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Id.* at 356. For purposes of this appeal, Krigbaum concedes that Edwards's sexual assaults deprived plaintiffs of a clearly established constitutional right to substantive due process when he committed "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective." *Johnson v. Phillips,* 664 F.3d 232, 239 (8th Cir.2011) (quotation omitted). Sheriff Krigbaum is entitled to qualified immunity unless he had notice of a pattern of conduct that was sufficiently egregious in nature. Qualified immunity

from supervisory liability turns on what Sheriff Krigbaum knew of Edwards's actions as tracker, not what Drug Court Administrator Graham–Thompson or Commissioner Sullivan knew.

The district court found that "[t]here is no evidence ... Krigbaum received notice of a pattern of unconstitutional acts," and that "Krigbaum did not know of any misconduct ... nor had he heard any rumors about Edwards paying particular attention to women." These findings establish that plaintiffs did not meet their burden to prove Krigbaum

*S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015).

## Deprivation of a Constitutional Right

Plaintiff alleges that Defendants violated his Eighth Amendment right by failing be free from cruel and unusual punishment through their failure to protect him from inmate Flennory's assault.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). To establish prison officials failed to prevent harm, the prisoner first must prove he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. This is an objective requirement to ensure the deprivation is a violation of a constitutional right. *See Jensen v. Clarke*, 94 F.3d 1191, 1197 (8th Cir. 1996). Second, the prisoner must establish the prison officials were deliberately indifferent to inmate health or safety. *See Farmer*, 511 U.S. at 834. This is a subjective requirement, mandating

the prisoner prove the official both knew of and disregarded "an excessive risk to inmate health or safety." *Id.* at 837.

Here, Plaintiff has not shown that Defendants knew that Flennory posed a substantial risk to Plaintiff and that they failed to respond reasonably to it. The undisputed evidence before the court shows that Defendants did not know that Flennory posed a threat to Plaintiff's safety.

At the time of the incident with Plaintiff, there had been no previous incidents involving sexual assault by Flennory. Defendant Shively was unaware that Flennory was a registered sex offender. Although Defendants were aware of the fact that Flennory was incarcerated for a sexual offence, Flennory had never been accused of assaulting fellow inmates prior to the time of the incident at issue. There was no evidence that Defendants actually knew that Flennory posed a substantial risk of harm to Plaintiff. There is no evidence or allegations that inmate rape is a common occurrence in this particular jail. Defendants were not aware of any threats or assaults because no one reported any; however, once they learned of the assault, Plaintiff was immediately moved. *Webb v. Lawrence Cty.,* 144 F.3d 1131, 1135 (8th Cir. 1998). "[p]risons are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence[, and t]he same is true for inmate who engage in violence while in prison." *Norman*

*v. Schuetzle*, 585 F.3d at 1097, 1105 (8th Cir. 2009) *overruled on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009).

Although Plaintiff attempts to impute knowledge of an assault on another inmate, the record establishes that to jail personnel, the inmate was injured when he fell and hit his head on a toilet, as the inmate reported.

Defendant Dawson was unaware, until after the incident that the jail cells were not being locked down in accordance with the jail's policy. Upon learning of same, Dawson reprimanded staff because of this error.

Plaintiff himself testified that he had no fear of Flennory prior to the time of the assault. He was on friendly terms with Flennory and the two played cards together. When Flennory stuck his finger in in his buttock crack, Plaintiff removed Flennory's finger, told him to leave and Plaintiff went to sleep. He did not report the incident, nor did he become frightened by it.

When Flennory exposed himself to Plaintiff, Plaintiff did not report fear, rather, Plaintiff believed Flennory was merely being "ignorant." No report was made by Plaintiff regarding this incident.

Likewise, with respect to the bat incident, Plaintiff testified that he did not become afraid of Flennory at that time, nor did he view the incident as a sexual attack.

Defendants are entitled to qualified immunity on Plaintiff's failure to protect claims.

A supervisor may be held individually liable under § 1983 if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation. *Tilson v. Forrest City Police Dep't,* 28 F.3d 802, 806 (8th Cir.1994), *cert. denied,* 514 U.S. 1004 (1995); *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007)

Because the Court concludes that Defendant Shively is entitled to qualified immunity on the failure to protect claims, Defendants Dawson and Moore are also entitled to qualified immunity on the failure to train claims.  Unless his subordinate, "'violated the Constitution,'" [a supervisor] cannot be liable 'for failure to train,' *Carpenter v. Gage,* 686 F.3d 644, 651 (8th Cir.2012)." *Walton v. Dawson*, 752 F.3d 1109, 1122 (8th Cir. 2014).

## Official Capacity Claims

Plaintiff has sued Defendants in their official capacity as well as their individual capacities.

> A suit against a governmental actor in his official capacity is treated as a suit against the governmental entity itself. *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (citing *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). A governmental entity cannot be held vicariously liable for its agent's acts under § 1983. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, a plaintiff must identify a governmental "policy or custom that caused the plaintiff's injury" to recover from a governmental entity

under § 1983. *Bd. of the County Comm'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citations and quotations omitted). A governmental policy "involves a deliberate choice to follow a course of action ... made from among various alternatives by an official who has the final authority to establish governmental policy." *Doe v. Special Sch. Dist.,* 901 F.2d 642, 645 (8th Cir.1990) (quotations and citations omitted). A governmental custom involves "a pattern of 'persistent and widespread' ... practices which bec[o]me so 'permanent and well settled' as to have the effect and force of law." *Id.* at 646 (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). "This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim." *McCoy v. City of Monticello,* 411 F.3d 920, 922 (8th Cir.2005).

*Brockinton*, 503 F.3d at 674. Since no Macon County defendant is individually liable for Plaintiff's underlying substantive claim, the County cannot be held liable under § 1983. Moreover, Plaintiff has failed to allege facts that show an unconstitutional policy or custom of the County, therefore, the official capacity claims against defendant are not meritorious. Defendants are entitled to summary judgment in their official capacities.

## CONCLUSION

Based upon the foregoing analysis, Plaintiff has failed to produce evidence that Defendants violated a constitutional right in that there is no evidence to establish that Defendants were aware of a substantial risk of harm to Plaintiff. As such, Defendants are entitled to qualified immunity. Summary Judgment is therefore properly granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, [Doc. No. 126], is **GRANTED.**

A separate judgment in accordance with this Opinion, Memorandum and Order is entered this same date.

Dated this 20th day of March, 2017.


                _____
                   HENRY EDWARD AUTREY
             UNITED STATES DISTRICT JUDGE